# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

**CENTENE CORPORATION,**

7700 Forsyth Boulevard
St. Louis, Missouri 63105,

**BRIDGEWAY HEALTH SOLUTIONS OF ARIZONA, INC.,**

1850 W. Rio Salado Parkway
Tempe, Arizona 85281,

**COORDINATED CARE CORPORATION,**

550 North Meridian, Suite 700
Indianapolis, Indiana 46204,

**MANAGED HEALTH SERVICES INSURANCE CORP.,**

801 South 60th Street
West Allis, Wisconsin 53214,

**MERIDIAN HEALTH PLAN OF MICHIGAN, INC.,**

777 Woodward Avenue
Detroit, Michigan 48226,

**NEW YORK QUALITY HEALTHCARE CORPORATION,**

25-01 Jackson Avenue
Long Island City, New York 11101,

**WELLCARE HEALTH INSURANCE COMPANY OF WASHINGTON, INC.,**

8725 Henderson Road
Tampa, Florida 33634,

**WELLCARE HEALTH INSURANCE OF THE SOUTHWEST, INC.,**

Case No. 4:24-cv-1415

1850 W. Rio Salado Parkway
Tempe, Arizona 85281,

**WELLCARE HEALTH PLANS OF VERMONT, INC.,**

7700 Forsyth Boulevard
St. Louis, Missouri 63105,

**WELLCARE OF ILLINOIS, INC.,**

1333 Burr Ridge Parkway
Burr Ridge, Illinois 60527,

**WELLCARE OF MISSOURI HEALTH INSURANCE COMPANY, INC.,**

7700 Forsyth Boulevard
St. Louis, Missouri 63105,

                    Plaintiffs,

v.

**XAVIER BECERRA**, in his official capacity as Secretary of Health and Human Services, U.S. Department of Health and Human Services

200 Independence Avenue SW
Washington, District of Columbia 20201,

and

**CHIQUITA BROOKS-LASURE**, in her official capacity as Administrator, Centers for Medicare and Medicaid Services

7500 Security Boulevard
Baltimore, Maryland 21244,

                    Defendants.

## COMPLAINT

Plaintiffs Centene Corporation, along with its affiliated entities Bridgeway Health Solutions of Arizona, Inc., Coordinated Care Corporation, Managed Health Services Insurance Corp., Meridian Health Plan of Michigan, Inc., New York Quality Healthcare Corporation, Wellcare Health Insurance Company of Washington, Inc., Wellcare Health Insurance of the Southwest, Inc., Wellcare Health Plans of Vermont, Inc., Wellcare of Illinois, Inc., and Wellcare of Missouri Health Insurance Company, Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby submit their complaint for relief against defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services ("HHS"), and Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services ("CMS"), to challenge unlawful, and arbitrary and capricious final agency action related to the Star Ratings system for Medicare Advantage and Part D health plan contracts, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 551-559 and 701-706.

## PRELIMINARY STATEMENT

Medicare Advantage Star Ratings are a critical part of the Medicare Advantage program as they measure plans' quality and performance, drive enrollment, and ultimately impact member benefits. Plaintiffs bring this case to rectify clear arbitrary and capricious conduct by CMS in connection with their 2025 Star Ratings.

Plaintiffs are health insurance plans that contract with CMS to operate as Medicare Advantage Organizations ("MAOs"). CMS evaluates the quality and performance of each MAO compared to other MAOs through a grading process called "Star Ratings." To calculate Star Ratings, CMS scores 40 different quality and performance measures for each MAO based upon certain data sets. CMS then assigns a score (or "Star") for each measure and each measure has a certain weight. The measure-specific scores are then aggregated on a weighted basis to Part C and

3

Part D summary Star Ratings, and finally to an overall Star Rating for each MAO. Among other things, overall Star Ratings are intended to be used by Medicare beneficiaries to identify higher quality plans during enrollment. Incorrect Star Ratings prevent members, as well as agents and brokers who assist those members, from having the right information to choose the best plans for the member.  Furthermore, plans with higher overall Star Ratings receive additional revenue that is used to reduce premiums and cost-sharing and offer additional benefits to members. Thus, lower Star Ratings directly create higher cost and less benefits for members.

One of the measures that CMS uses to calculate Star Ratings is the success rate of calls that CMS "secret shoppers" (also referred to as surveyors or interviewers) make to the plan through Text-to-Voice teletypewriter ("TTY") services.[1] Notably, while a TTY machine (device) or Internet Protocol (enabled) TTY software ("IPTTY") can be used for TTY functionality, in accordance with applicable CMS guidance, CMS secret shoppers use IPTTY software to make these calls. CMS scores this measure based upon the number of successful calls that connect to the plan's call center compared to the number of calls made. CMS guidance used to score this measure counts a call as "unsuccessful" (and therefore held against the plan) if the secret shopper call connected to the plan, and there was a call failure that was not attributable to the CMS secret shopper. In other words, if there was a call failure attributable to CMS or its secret shopper in any way, then the call is not treated as "unsuccessful" and not held against the MAO. However, for Plaintiffs, CMS has decided to hold *a single* IPTTY call against Plaintiffs, despite the fact that the call never reached Plaintiffs' call center, and there was no call failure due to Plaintiffs. Rather, the CMS secret shopper's own call notes show that the shopper's IPTTY "chat window closed unexpectedly," which is a clear failure of CMS's software.

---

[1]    CMS uses a vendor to conduct the TTY secret shopper audits.

4

CMS bases its TTY scoring measure on only a handful of secret shopper calls in a given measurement period and a 5-star score requires 100% of TTY calls to be successfully completed. Therefore, the inclusion of even a single incorrect TTY call in the denominator has significant cascading effects. For Plaintiffs, CMS's arbitrary decision to hold the single call against them resulted in Plaintiffs receiving an improperly lowered score for the relevant measure and, in turn, lower Part D summary Star Ratings and overall Star Ratings for several of Plaintiffs' contracts. While CMS' mistake affected only a single call, the impact of CMS's decision is profound.

On October 10, 2024, CMS published the final Star Ratings to the public via CMS' online enrollment website, known as the Medicare Plan Finder. The Medicare Advantage annual enrollment period is from October 15, 2024 and continues through December 7, 2024, and then the Medicare Advantage open enrollment period commences on January 1, 2025 and continues through March 31, 2025. During those periods, Medicare beneficiaries and enrollment brokers and agents will rely upon Star Ratings to shop for and select plans. Because Star Ratings are an important factor in plan selection, CMS's arbitrary and capricious decision and corresponding improper Star Ratings will cause Plaintiffs to lose potential enrollees. In addition to the immediate enrollment impact, the erroneous Star Ratings will cause Plaintiffs to lose an estimated $73 million in gross revenue, which Plaintiffs would reinvest in reduced premiums and increased benefits for its members. Beyond the impact to Plaintiffs' members, CMS's decision will force Plaintiffs to lose other opportunities that are available to plans with higher Star Ratings and may create compliance actions by CMS that will jeopardize the plans' ability to operate. These are staggering consequences for a *single call* that never connected to Plaintiffs' call center because the CMS secret shopper's IPTTY software "closed unexpectedly." Plaintiffs accordingly seek this Court's assistance in correcting this clear injustice and obvious arbitrary and capricious conduct.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331. This action arises under the Medicare Act, 42 U.S.C. § 1395 *et seq.*; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

2.      Venue is proper under 28 U.S.C. § 1391(e)(1).

3.      This Complaint is timely filed. *See* 28 U.S.C. § 2401.

## PARTIES

4.      Centene Corporation is a healthcare company with its principal place of business in St. Louis, Missouri. Centene is a leading healthcare enterprise that is committed to helping people live healthier lives. Centene takes a local approach—with local brands and local teams—to provide fully integrated, high-quality, and cost-effective services to government-sponsored, government-subsidized, and commercial healthcare programs. Centene provides affordable and high-quality products to more than 28 million members across the nation, including Medicare, Medicaid, Marketplace, and TRICARE beneficiaries.

5.      Centene, through direct and indirect subsidiaries, operates numerous health plans across the nation.[2] Specifically, the following health plan Plaintiffs are direct or indirect subsidiaries of Centene that enter into contracts with Defendants to provide coverage to Medicare beneficiaries under Medicare Parts C and/or D, and who have all suffered damages in the form of

---

[2]      A list of Centene's subsidiaries can be found in the filed Corporate Disclosure Statement. For any subsidiary that operates an MAO contract, the TTY calls are handled by the same call center as Plaintiffs' call center. These plans also were injured by the failure to invalidate this single call resulting in an unlawful decrease of their D01 measure score. However, the D01 measure score change would not, in and of itself, change the subsidiaries' Part D summary Star Rating or overall Star Rating and, therefore, they have not joined in this complaint. However, under CMS' rules and guidance, any applicable finding to one contract on the single disputed call should likewise be corrected for all affected contacts.

improperly reduced measure-specific Star scores, Part D summary Star Ratings, and/or overall Star Ratings:

a. Bridgeway Health Solutions of Arizona, Inc. has its principal place of business in Tempe, Arizona, and has entered into a contract with CMS designated as H5590;

b. Coordinated Care Corporation has its principal place of business in Indianapolis, Indiana, and has entered into a contract with CMS designated as H6348;

c. Managed Health Services Insurance Corp. has its principal place of business in West Allis, Wisconsin, and has entered into a contract with CMS designated as H8189;

d. Meridian Health Plan of Michigan, Inc. has its principal place of business in Detroit, Michigan, and has entered into a contract with CMS designated as H5475;

e. New York Quality Healthcare Corporation has its principal place of business in Long Island City, New York, and has entered into a contract with CMS designated as H5599;

f. Wellcare Health Insurance Company of Washington, Inc. has its principal place of business in Tampa, Florida, and has entered into a contract with CMS designated as H5965;

g. Wellcare Health Insurance of the Southwest, Inc. has its principal place of business in Tempe, Arizona, and has entered into a contract with CMS designated as H8553;

      h.     Wellcare Health Plans of Vermont, Inc. has its principal place of business in St. Louis, Missouri, and has entered into a contract with CMS designated as H1862;

      i.     Wellcare of Illinois, Inc. has its principal place of business in Burr Ridge, Illinois, and has entered into a contract with CMS designated as H6713; and

      j.     Wellcare of Missouri Health Insurance Company, Inc. has its principal place of business in St. Louis, Missouri, and has entered into a contract with CMS designated as H7518.

6.     Defendant Xavier Becerra is sued in his official capacity as the Secretary of HHS. This includes overseeing the operations of CMS. Secretary Becerra, in his official capacity, is responsible for implementing and complying with federal law, including the federal laws impacted by this action.

7.     Defendant Chiquita Brooks-LaSure is sued in her official capacity as Administrator of CMS, an operating division of HHS. As Administrator, Ms. Brooks-LaSure is responsible for the administration of the Medicare health insurance program, including Medicare Parts C and D. Administrator Brooks-LaSure, in her official capacity, is responsible for implementing and complying with federal law.

## FACTUAL ALLEGATIONS

### *The Medicare Advantage Program and Star Ratings*

8.     Generally, people who are eligible for Medicare have two options to receive medical benefits. First, under original Medicare, eligible individuals may receive Medicare benefits directly from the federal government. *See* 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B). Alternatively, under Medicare Part C—commonly referred

to as the Medicare Advantage program—CMS contracts with private organizations to administer Medicare benefits through a health plan. Medicare eligible individuals may enroll in health plans offered by an MAO, and the MAO is responsible for providing Medicare benefits to their enrollees. In addition, Medicare beneficiaries may also obtain prescription drug coverage through Medicare Part D. Like Medicare Advantage, the Part D prescription drug benefit provides coverage through organizations that contract with CMS to offer health plans that cover prescription drugs. These plan sponsors offer both standalone prescription drug plans ("PDPs") for individuals enrolled in traditional Medicare, as well as drug coverage with a Medicare Advantage plan (called a "MA-PD" plan). *See* 42 U.S.C. § 1395w–101(a)(1), (3)(C).

9.      In 2008, CMS began publishing annual Star Ratings for MAOs ("Star Ratings"), which are based upon certain data sets, to rate each plan on a scale of 1 to 5 Stars. *See* 42 U.S.C. § 1395w-23(o); *see also* 42 C.F.R. Part 422, Subpart D. The purpose of Star Ratings is to help Medicare consumers "compare the quality of Medicare health and drug plans being offered so they are empowered to make the best health care decisions" and provide "meaningful information about quality, alongside information about benefits and costs, to assist them in comparing plans and choosing the Medicare coverage option that best fits their health needs." *See, e.g., 2025 Medicare Advantage and Part D Star Ratings*, CENTERS FOR MEDICARE & MEDICAID SERVICES (October 10, 2024),      https://www.cms.gov/newsroom/fact-sheets/2025-medicare-advantage-and-part-d-star-ratings#:~:text=Approximately%2040%25%20of%20MA%2DPDs,or%20more%20stars%20in%202025.

10.     Star Ratings are based on a 5-Star scale, set in half-star increments, with 1 Star being the lowest rating and 5 Stars being the highest. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii). CMS calculates Star Ratings by assessing and individually grading (by giving a

1 to 5-Star score) several "measures" that fall into broad categories designed to measure the quality of the plan. Each measure has a certain weight assigned to it, and then the scores for the individual measures are used to calculate an overall weighted Part C and Part D summary Star Rating and overall Stars Rating for each plan.

11.     The Star Rating assigned by CMS is critically important to an MAO and Medicare beneficiaries for several reasons, including enrollment and member benefits. With respect to enrollment, the "annual enrollment period" for Medicare beneficiaries is from October 15, 2024 to December 7, 2024, during which time eligible people can begin to openly enroll in MAOs. 42 U.S.C. § 1395w-21(e)(3)(B)(v). After the annual enrollment period, the Medicare Advantage "open enrollment period" is from January 1, 2025 through March 31, 2025, during which time certain Medicare beneficiaries can continue to enroll in plans. CMS facilitates the plan selection process by maintaining a website known as the "Medicare Plan Finder," which is an online tool that displays information about available plans, including the Star Ratings for the upcoming plan year, to assist beneficiaries in choosing the coverage that is right for them. *See* 42 C.F.R. § 422.166(h).

12.     On October 10, 2024, CMS published Star Ratings on the Medicare Plan Finder and Medicare beneficiaries, as well as agents and brokers who assist those beneficiaries, began to rely upon those ratings beginning October 15 to select plans. Given that Star Ratings are intended to be used by Medicare beneficiaries to identify plans that CMS has identified as higher quality relative to other choices, plans with higher Star Ratings are at a significant advantage in their efforts to enroll beneficiaries. In addition, MAOs that are below a threshold Star Rating receive a "low performance indicator" on the Medicare Plan Finder and could potentially be prohibited from participating in other programs and expanding their service offerings.

13.     In addition to enrollment, under the Congressionally mandated "Quality Bonus Payment" program, MAOs that receive an overall Star Rating of 4 or more Stars are entitled to higher payments from Defendants. In addition, MAOs submit annual bids each year that are scored against a benchmark financial target. If a plan submits a bid below the benchmark, the plan is able to retain a portion of the savings (called a "rebate").  A plan's Star Rating affects the amount of rebate the plan can retain. Specifically, plans with a Star Rating of 3.0 or lower keep 50% of the rebate, plans with a Star Rating of 3.5 or 4.0 keep 65% of the rebate, and plans with a Star Rating of 4.5 or 5 keep 70% of the rebate. That additional revenue must then be used to reduce premiums, coinsurance and/or cost-sharing, and/or increase health and related benefits. Thus, MAOs with higher Star Ratings can offer more competitive products to potential members and ensure that current members retain existing benefits.

*CMS's Plan Preview Process is Established to Question and Challenge
Star Ratings Before Releasing the Ratings to the Public*

14.     Prior to publishing an MAO's Star Ratings, CMS administers two plan preview periods—referred to as "Plan Preview 1" and "Plan Preview 2." *See* 42 C.F.R. § 422.166(h)(2).

15.     These plan preview periods allow MAOs to review and challenge the agency's calculated measure scores and corresponding Star Ratings. To protect plans against erroneous evaluations that could unfairly undermine their ability to compete for customers, CMS initiates and concludes this process before it finalizes the Star Ratings and publishes them on the Medicare Plan Finder.

16.     Plan Preview 1 lasted from August 7-14, 2024 and allows for review of the methodology and posted numeric data for each measure. *See* 83 Fed. Reg. 16440, 16588 (April 16, 2018); HPMS Memo, *First Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Aug. 6, 2024.

17.    Plan Preview 2 occurred from September 6-13, 2024. *See* 83 Fed. Reg. 16440, 16588 (April 16, 2018); HPMS Memo, *Second Plan Preview of 2025 Medicare parts C and D Star ratings Data*, Sept. 5, 2024. During Plan Preview 2, CMS makes any revisions necessitated by changes arising during Plan Preview 1 and allows plans to review their preliminary Star Ratings for each measure, domain, summary Star Rating, and overall Star Rating.

*Stars Quality Measure D01 Involves CMS's Evaluation*
*of an MAO's Call Center TTY Availability*

18.    MAOs must maintain a toll-free customer service call center. 42 C.F.R. § 422.111(h). CMS assesses each plan's Part D call center performance based on a measure known as "D01 – Call Center – Foreign Language Interpreter and TTY Availability." *See e.g., Medicare 2025 Part C & D Star Ratings Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Oct. 3, 2024), at 80-81.

19.    To measure D01 scores, CMS conducts "secret shopper" calls to plans to measure the plan's accessibility via TTY. TTY is a type of Telecommunication Relay Service ("TRS") often used by people with hearing or speech disabilities. The Federal Communications Commission ("FCC") has mandated the use of TRS as a public service on a national basis, and furthermore mandated 711 as a dialing code for access to TRS services. 47 U.S.C. § 225.

20.    711, which is akin to 911, allows any person to dial 711 and connect with a TRS operator (the "711 Operator") who helps facilitate the call through a TTY device. The FCC regulates TRS/711 services and pays for the services through government funds. *See, e.g.,* 47 C.F.R. Part 64, Subpart F.

21.    The purpose of allowing the use of 711 and mandating TRS services is to allow deaf and hard of hearing consumers to utilize relay services to connect with people and businesses like MAOs. 711 Operators are completely independent of any consumers or businesses, including

Plaintiffs. Because 711 has been designated by the FCC as a nationwide method to connect to any person or company through the federally-mandated TRS (including TTY), the vast majority of MAOs identify 711 as the number to call to facilitate TTY access to the plan.

22.    With respect to TTY, CMS assesses the D01 quality measure by having its secret shoppers call the plan using an IPTTY software. CMS guidance states that a TTY call is successful if the secret shopper establishes contact with and confirms that the customer service representative can answer questions about the plan's Medicare Part D benefit within seven minutes. *See, e.g., Medicare 2025 Part C & D Star Ratings Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Oct.. 3, 2024), at 80. CMS then determines the success rate by comparing the number of attempted TTY calls to the number of completed TTY calls. That success rate is then used to determine the D01 measure score. D01 is highly weighted in the overall Star Rating calculation and, therefore, has an outsized impact on the overall score.

23.    To better understand the process, it may be helpful to visualize the sequence of communications that occur between a CMS secret shopper (acting like a speech or hearing impaired member), the 711 Operator, and a health plan. First, the CMS secret shopper utilizes the IPTTY software to place a call to the 711 Operator. The IPTTY software has a chat window that is used to dial the number and through which the secret shopper communicates with the 711 Operator by typing in the chat window. When the CMS secret shopper reaches the 711 Operator, the shopper provides the health plan's phone number. The 711 Operator then acts as an intermediary by dialing the health plan's number and facilitating communication between the secret shopper and the health plan's call representative. *If the call drops before making contact with the health plan, it is clear that the call should not be held against the health plan in the CMS TTY audit.*

24.     Applicable CMS guidance states that "[c]ompleted contact using a TTY device is defined as establishing contact with and confirming that the [plan's customer service representative] can answer questions about the plan's Medicare Part C (or Part D) benefit within seven minutes. *Remember:* A call is considered connected for TTY cases when the caller reaches the plan." Thus, CMS is clear that the call must reach the plan for it to count.

25.     CMS guidance is further clear that "if [CMS] disconnect[s] the line with the relay operator, we will not count the outcome of the call in the plan's performance." *See Medicare Part C & D Call Center Monitoring Accuracy and Accessibility Study Technical Notes*, CTRS. FOR MEDICARE & MEDICAID SERVS., at pp. 20-21. Thus, CMS invalidates calls when, among other reasons, CMS caused the call to fail or otherwise not connect to the plan.

26.     CMS guidance further states that it "attempt[s] to create an authentic experience of a Medicare beneficiary trying to receive assistance via a TTY device [and] [o]ur policy is to report an unsuccessful call if, after three attempts, we cannot connect to the relay operator." *Id.* at 19.

*A Single TTY Call that CMS Arbitrarily Held Against*
*Plaintiffs Has Caused Extensive Harm*

27.     In this case, Plaintiffs' Star Rating for the D01 measure turns on a single TTY call that CMS erroneously held against Plaintiffs and refused to exclude from Plaintiffs' calculation. That call is referred to as "Call ID D1400849."

28.     CMS and Plaintiffs agree that Call ID D1400849 never connected to the plan's call center. To be sure, Plaintiffs verified in their call data that they did not receive an incoming TTY call on the date and during the time window that Call ID D1400849 occurred, and CMS has never taken the position that the call connected to Plaintiffs' call center. Nevertheless, CMS has held the call against Plaintiffs—counting it as an "unsuccessful" call—and CMS has refused to remove it from the D01 measure denominator for Plaintiffs.

29.    CMS provides the secret shopper's call notes for each call (called the "finish notes"). For Call ID D1400849, the CMS finish notes state: "tty opr asked for number to dial // I typed the number // tty opr asked again for the number // I typed it again then the ***chat window closed unexpectedly*** right after typing the number, tty opr asked for number to dial // I typed the number // tty opr asked again for the number // I typed it again then the ***chat window closed unexpectedly*** right after typing the number." These finish notes alone establish that the CMS secret shopper's IPTTY software experienced an error. Specifically, these finish notes show that the 711 Operator was on the call asking for the secret shopper to provide the number to dial, but the secret shopper's "chat window closed unexpectedly" while typing. Despite that clear evidence showing a failure by the secret shopper's chat window, CMS held this call against Plaintiffs as an "unsuccessful" call.

30.    Importantly, CMS secret shoppers utilize an IPTTY software application that simulates the features of a TTY device on a computer and uses an internet connection to display the communications with the 711 Operator. IPTTY software operates over the internet and is dependent upon several factors, including a stable computer with sufficient resources and a reliable internet connection. The IPTTY software contains a chat window for the CMS secret shopper to interact with the TTY operator. Because IPTTY software relies upon the internet, users experience the same network internet performance issues that impact normal internet usage such as intermittent drops, low processing speeds, *etc.* Such performance issues cause outcomes such as frozen screens, web browsers running slowly, or a call window to close unexpectedly. The documentation received from CMS stating the "chat window to closed unexpectedly" shows an issue with the IPTTY software used by the CMS secret shopper, likely because the software experienced an unstable or intermittently degraded internet connection or some other disruption.

Thus, the inability of the secret shopper to connect to the plan was due to a software or internet connectivity issue experienced by the CMS secret shopper and, pursuant to CMS's guidance, this call should not have been held against Plaintiffs.

31.    When Plaintiffs questioned the incorporation of this call in their D01 measure scores, CMS provided a call log (Call Log #1) that clearly shows the sequence of events where the CMS secret shopper connected with the 711 Operator, and then the CMS secret shopper disconnected the call. This is consistent with the secret shopper's call notes which twice state that the "chat window closed unexpectedly."

32.    When Plaintiffs questioned CMS as to why Call ID D1400849 was being held against them in light of Call Log #1, CMS then provided a second call log (Call Log #2) that showed a different sequence of call events. According to CMS, Call Log #2 shows the 711 Operator disconnecting the call first and that is the appropriate sequence of events.

33.    Neither Call Log #1 nor Call Log #2 contains the seconds or microseconds when the call activity occurred, making it impossible for CMS to conclude that Call Log #2 is more appropriate. Indeed, CMS has never explained why Call Log #2 is correct or more accurate than Call Log #1. Plaintiffs asked for call logs that reflect seconds for the call activities, but CMS stated that "they do not exist." Additional documentation provided by CMS is also inconsistent. For instance, CMS provides raw call center data, which indicates that the call started at 19:11:40, while another document provided by CMS indicates that the call started at 19:11:34. This data discrepancy calls into question the veracity of the data for this call.

34.    Because it is clear from the CMS secret shopper's finish notes that an error occurred with the secret shopper's IPTTY software closing unexpectedly, in the plan preview process, Plaintiffs provided additional documentation, including a declaration of a telephony expert,

demonstrating how such a failure can occur and how it is not the result of any action or inaction taken by Plaintiffs or the 711 Operator. However, CMS has repeatedly ignored the evidence provided to CMS by Plaintiff and CMS has never explained what caused the IPTTY failure.

35.     Recognizing that the call never connected to Plaintiffs' call center and while ignoring the failure of its own secret shopper's software, CMS takes the position that the 711 Operator is Plaintiffs' "agent," and consequently CMS can hold the call against Plaintiffs. However, the evidence shows that the failure occurred due to the CMS secret shopper's IPTTY software "chat window clos[ing] unexpectedly"—which is a failure of the CMS secret shopper's software.

36.     Furthermore, even if the failure occurred due to the 711 Operator dropping the call, TRS and access through dialing 711 is a public service, funded by government dollars, that is available to all free of charge. *See, e.g.,* 47 C.F.R. Part 64, Subpart F.  711 Operators have no relationship (contractual or otherwise) with Plaintiffs and are regulated by the FCC. *Id.* Lest there be any doubt, in its rulemaking codifying the call center TTY requirements for MAOs, CMS acknowledged that MAOs have no authority or control over 711 Operators and the TRS systems. *See* 86 Fed. Reg. 5864, 6008 (Jan. 19, 2021). Thus, CMS's position that a 711 Operator is an agent of Plaintiffs is contrary to the law and arbitrary and capricious.

37.     Measure D01 requires a 100% success rate across all secret shopper calls to be awarded 5 Stars. Therefore, by holding this single Call ID D1400849 against Plaintiffs, all of Plaintiffs' contracts' D01 measures received a rating of 4 Stars instead of the 5 Stars that Plaintiffs actually earned. Furthermore, due to the heavily weighted nature of D01, seven of Plaintiffs received a lower overall Star Rating for their entire contract, and four of Plaintiffs' health plan contracts received a lower Part D summary Star Rating.

38.     Penalizing Plaintiffs for a single call that the evidence shows was dropped by the CMS secret shopper and, in any event, made through a federally-funded public TTY service that never touched its phone system is arbitrary and capricious, contrary to law, and does nothing to advance CMS's objectives of plan accessibility or assessment of the quality of Plaintiffs' health plans.

<u>*CMS's Decision as to the Single Call Has Caused Plaintiffs Extensive Harm*</u>

39.     CMS's failure to invalidate the disputed call will have a severe cascading negative impact on Plaintiffs and their members.

40.     As described above, CMS published Star Rating scores in Medicare Plan Finder on October 10, 2024, making them available to the public. On October 15, 2025, the annual enrollment period began and potential enrollees across the country, as well as the agents and brokers who assist those enrollees, will rely upon the incorrect Star Ratings when seeking to enroll in plans for 2025. This deterrent effect on prospective customers will continue during the open enrollment period starting January 1, 2025 and as long as the incorrect Star Ratings are published.

41.     In addition, by not invalidating the disputed call, CMS's unlawful conduct is estimated to have over a collective $73 million gross revenue impact on Plaintiffs. That lost revenue directly impacts Plaintiffs' members as it would be used to reduce premiums and provide for enhanced benefits to members.

42.     Beyond the impact in enrollment and benefits, CMS's arbitrary decision will cause some of Plaintiffs' contracts to receive penalties for failing to achieve at least a 3-Star rating. When coupled with prior scores, certain contracts received a "low performance indicator" on the Medicare Plan Finder and will potentially be prohibited from offering value-based insurance design ("VBID") benefits or expanding their service offerings. Furthermore, the legal entity that

holds such contract(s) may be prohibited from applying to expand service areas and/or applying for a new contract. These consequences are all from a single call that never made it to the Plaintiffs' call center, yet CMS arbitrarily concluded should count against Plaintiffs.

43.     Notably, CMS's decision regarding the single call it is holding against Plaintiffs is symptomatic of what appear to be systemic issues with CMS's IPTTY software and secret shopper program more generally. Indeed, in late 2023 and early 2024, several health plans filed lawsuits against CMS relating to secret shopper audits. Furthermore, in the weeks prior to this lawsuit, two other plans (United Healthcare and Humana) have filed lawsuits in Texas federal court raising additional issues with CMS's secret shopper program.

## *Final Agency Action*

44.     CMS's Star Ratings decision for Plaintiffs, which includes the agency's final decision about the disputed call, is a final agency action within the meaning of 5 U.S.C. § 704.

45.     CMS's Star Ratings decision is an agency action within the meaning of 5 U.S.C. §§ 551(6) and (13), because it is an "order" constituting an agency's final disposition in a matter other than rule making.

46.     As noted above, CMS has established a process for informal communication with the CMS Call Center Monitoring (the segment of CMS responsible for the D01 measure), and provides for Plan Preview 1 and Plan Preview 2. Plaintiffs have challenged Call ID D1400849 through communications to CMS Call Center Monitoring, as well as during both plan preview periods, and CMS has conclusively and repeatedly stated its decision is final.

47.     In response to Plaintiffs' challenge of Call ID D1400849 to the CMS Call Center Monitoring, on July 25, 2024, CMS responded stating that Call ID D1400849 would remain "as is."

48.     On August 7, 2024, Plaintiffs submitted a detailed response in connection with Plan Preview 1 rebutting the information provided by CMS Call Center Monitoring and providing additional documentation in support of its position.

49.     On August 12, 2024, CMS responded to Plaintiffs, indicating again the "call will remain as is."

50.     After several other communications to CMS continuing to challenge the call, on September 4, 2024, CMS Responded and stated that: "CMS has provided the rationale and documents supporting our decision, and that decision is final."

51.     On September 13, 2024, in connection with Plan Preview 2, Plaintiffs submitted additional detailed information to CMS regarding Call ID D1400849, including a declaration from a telephony expert explaining how the finish notes of a "chat window clos[ing] unexpectedly" is consistent with a failure by CMS's IPTTY software. Despite that additional information, CMS's response inexplicably stated: "The provided submission does not contain new information. CMS will not be altering our previous determination." As is clear, CMS simply ignored this additional information that demonstrates CMS's decision is incorrect.

52.     On October 10, 2024, CMS published the final Star Ratings to the public via the Medicare Plan Finder. CMS's Star Rating decision after the plan preview period is a final agency action because the ratings are now publicly announced for consideration by current and potential customers during 2025 enrollment.

53.     CMS's Star Ratings decision is also a final agency action because it has determined Plaintiffs' legal rights and obligations and otherwise triggered legal consequences for Plaintiffs, including, but not limited to, impact on enrollment and low performing plan letters being sent out to members. Furthermore, CMS may terminate a plan's Medicare Advantage contract that has

failed to achieve a Part C summary rating of at least three Stars for three consecutive contract years. 42 C.F.R. § 422.510(a)(4)(xi).

54.     CMS lacks a process for relief[3] that could render a decision in time for the Plaintiffs harm to be mitigated. Further, as set forth above, CMS has repeatedly stated its decision is final and it will not be altering that decision. Plaintiffs have therefore been forced to file this action as Plaintiffs stand to suffer reputational harm, loss of potential and actual customers, and millions of dollars unless this Court intervenes.

## CLAIMS FOR RELIEF

### *First Claim For Relief*

*(Violation of Administrative Procedure Act – Arbitrary and Capricious Agency Action, Decision Not Supported by Substantial Evidence, and Contrary to Law)*

55.     Plaintiffs incorporate Paragraphs 1 through 54 of this Complaint as if set forth fully herein.

56.     Under 5 U.S.C. § 706(2)(A), an agency action can be held unlawful and set aside if it is arbitrary, capricious, or contrary to law.

57.     CMS's decision to hold Call ID D1400849 against Plaintiffs with respect to measure D01 for Plaintiffs' Star Ratings was arbitrary, capricious, and contrary to law.

58.     CMS requirements hold that TTY calls must connect to the call center and Call ID D1400849 never connected to Plaintiffs' call center.

59.     As set forth above and incorporated herein, Call ID D1400849 never connected with Plaintiffs' call center and, therefore, should not be held against Plaintiffs.

---

[3]     There is a non-mandatory reconsideration and informal hearing process available for CMS's quality bonus payment ("QBP") determinations that result from the Star Ratings. *See* 42 C.F.R. § 422.260. That informal process occurs after CMS's final decision and publication of the Star Ratings. In addition, the informal QBP reconsideration process allows for only extremely narrow challenges of limited data and Plaintiffs are not permitted to raise all challenges raised here.

60.     CMS's decision to hold Call ID D1400849 against Plaintiffs is arbitrary and capricious and unsupported by any evidence. CMS ignored CMS's own secret shopper's finish notes and additional information and evidence submitted by Plaintiffs that shows the call failed due to the CMS secret shopper's IPTTY software's chat window closing expectedly, likely experienced during a moment of instability with the internet or the software.

61.     To the extent CMS maintains its position that the call is to be held against Plaintiffs on the basis of CMS's position that the 711 Operator is Plaintiffs' agent, that is arbitrary, capricious, and contrary to law. 711 is a publicly funded program and 711 Operators are not and can never be agents of Plaintiffs.

62.     Accordingly, CMS's decisions related to the D01 quality measure for Star Ratings were arbitrary, capricious, and contrary to law as applied to Plaintiffs.

63.     Plaintiffs were adversely affected as a direct result of CMS's actions, which is estimated to have an approximately $73 million gross revenue impact on Plaintiffs. In addition, Plaintiffs also stand to suffer imminent and irreparable harm, such as through reputation harm, and loss of potential and actual customers.

64.     Plaintiffs therefore respectfully request the relief as prayed for below.

### _Second Claim For Relief_

_(Declaratory Judgment)_

65.     Plaintiffs incorporate Paragraphs 1 through 54 of this Complaint as if set forth fully herein.

66.     CMS's calculation of the Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2).

67.     Plaintiffs are adversely affected and harmed by the calculation of their Star Ratings.

68.     An actual controversy has arisen and exists between the Plaintiffs and Defendants regarding CMS's calculation of Plaintiffs' Star Ratings when CMS incorporated a call that never even reached the Plaintiffs' call center in calculating Plaintiffs' scores.

69.     Plaintiffs request a declaration from this Court under 28 U.S.C. § 2201 that CMS's calculation is arbitrary and capricious.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask this Court to:

A.      Enter judgment against Defendants and in favor of Plaintiffs for each count alleged in this Complaint;

B.      Issue an injunction ordering Defendants to recalculate Plaintiffs' Star Ratings without considering the disputed call (and immediately publish the recalculated Star Ratings in the Medicare Plan Finder);

C.      In the alternative, hold that Plaintiffs' Star Ratings decision is unlawful and remand the matter to CMS to recalculate forthwith Plaintiffs' Star Ratings without considering the disputed call (and immediately publish the recalculated Star Ratings in the Medicare Plan Finder); and

D.      Grant such other and further relief as the Court deemed just and proper.

Dated:  October 22, 2024                Respectfully submitted,

                                        By: */s/ Catherine Hanaway*
                                        Catherine Hanaway, Bar #41208
                                        Tanner Cook, Bar #71846
                                        Katherine B. Ledden, #66036
                                        HUSCH BLACKWELL LLP
                                        8001 Forsyth Boulevard, Suite 1500
                                        St. Louis, MO 63105
                                        (314) 480-1903
                                        catherine.hanaway@huschblackwell.com
                                        tanner.cook@huschblackwell.com
                                        kate.ledden@huschblackwell.com

                                        Martin J. Bishop (*pro hac vice forthcoming*)
                                        Steven D. Hamilton (*pro hac vice forthcoming*)
                                        REED SMITH LLP
                                        10 South Wacker Drive
                                        40th Floor
                                        Chicago, IL 60606
                                        (312) 207-1000
                                        mbishop@reedsmith.com
                                        shamilton@reedsmith.com

                                        Lesley C. Reynolds (*pro hac vice forthcoming*)
                                        Lara E. Parkin (*pro hac vice forthcoming*)
                                        David A. Bender (*pro hac vice forthcoming*)
                                        REED SMITH LLP
                                        1301 K Street, N.W.
                                        Suite 1000 – East Tower
                                        Washington, D.C. 20005
                                        (202) 414-9200
                                        lreynolds@reedsmith.com
                                        lparkin@reedsmith.com
                                        dbender@reedsmith.com

                                        *Counsel for Plaintiffs*